Lauren DeVoe (15122)
Stephen Aina (14579)
7070 South Union Park Avenue, Suite 220
Midvale, Utah 84047
Tel: (801) 790-9000
Email: Lauren@morrisdevoe.com
          Stephen@morrisdevoe.com

*Attorneys for Plaintiffs, Michael Eisenberg, Nouriel Roubini & David Shusterman*

### IN THE DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MICHAEL EISENBERG, an individual; NOURIEL ROUBINI, an individual; and DAVID SHUSTERMAN, an individual;<br><br>Plaintiffs,<br>vs.<br><br>GRIFFITHS & TURNER / GT TITLE SERVICES, a Utah corporation,<br><br>Defendant. | **COMPLAINT**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiffs hereby allege and complain against Defendant GRIFFITHS & TURNER / GT TITLE SERVICES, a Utah Corporation ("GT Title") as follows:

### NATURE OF THE ACTION

1.       Plaintiffs bring this action as the result of a soured transaction to purchase real estate in Weber County, Utah in which GT Title served as escrow agent but failed to satisfy its fiduciary duties to Plaintiffs, fraudulently failed to disclose material information, and conspired with and aided and abetted others in breaching contractual obligations and conversion.

### PARTIES

2.       Plaintiff Michael Eisenberg is a resident of the state of Florida.

3.       Plaintiff Nouriel Roubini is a resident of the state of New York.

4.      Plaintiff David Shusterman is a resident of the state of New York.

5.      Defendant GT Title is a for-profit corporation with a primary place of business in the city of Lehi, Utah County, State of Utah.

## JURISDICTION AND VENUE

1.      This Court holds subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a).

2.      This Court holds personal jurisdiction over Defendant GT Title because GT Title was doing business in Utah at times relevant to this Complaint, and this dispute arises from contract to purchase real property located in Weber County, Utah.

3.      Venue is proper in this Court.

## GENERAL ALLEGATIONS

4.      On or about April 6, 2017, Plaintiffs[1] entered into a real estate purchase contract with SMHG Phase I, LLC ("**SMHG**") to purchase Lot 71 (the "**REPC**") in Summit Eden Phase 1C of the Villages at Summit Powder Mountain project (the "**Project**") for $735,500.00. A true and correct copy of the REPC is submitted herewith as **Exhibit 1**.

5.      Pursuant to the REPC, Plaintiffs were required to deposit earnest money totaling $147,100.00 (the "**Earnest Money Deposit**") "in a trust account established by [Defendant] GT Title Services, Inc."

6.      The REPC further provides that it, "together with [GT Title's] general instructions, if any, shall constitute escrow instructions to" GT Title. (Ex. 1, REPC, ¶ 7.1).

---

[1] Although SMHG only allowed for two (2) names on the contract to purchase Lot 71, Mr. Eisenberg, Mr. Roubini, and Mr. Shusterman were purchasing Lot 71 together.

7.      Plaintiffs deposited the $147,100.00 Earnest Money Deposit with GT Title in accordance with the REPC on or before April 27, 2017.

8.      Plaintiffs and SMHG executed six (6) addendums to the REPC, true and correct copies of which are submitted herewith as follows: **Exhibit 2**, First Addendum; **Exhibit 3**, Second Addendum; **Exhibit 4**, Third Addendum; **Exhibit 5**, Fourth Addendum; **Exhibit 6**, Fifth Addendum; and **Exhibit 7**, Sixth Addendum.

9.      The First Addendum contains provisions should either the buyer—Plaintiffs—or seller—SMHG—default. Specifically, the First Addendum states:

**4.      DEFAULT.**

4.1.   **Buyer Default.** If Buyer fails to timely perform any of its obligations under this REPC, including the deposit of all necessary documents and funds by the Closing Deadline, Seller may deliver to Buyer a written notice demanding that Buyer comply with the terms of this REPC within twenty (20) calendar days from receipt of notice to Buyer. If at the expiration of such period, Buyer has not complied, then Seller, in Seller's sole and absolute discretion, may elect either to: (i) terminate this REPC and retain the Deposit as liquidated damages without being subject to the dispute resolution procedures contained in Section 5, and thereafter the parties shall be released of all further duties and obligations under this REPC; (ii) obtain specific performance of Buyer's duties and obligations under this REPC; or (iii) pursue any other remedy available at law or in equity. Notwithstanding the foregoing, if Buyer defaults after depositing earnest money with the Title Company equal to 15% or more of the Purchase Price (exclusive of interest, if any), and Seller elects to terminate this REPC, then Seller will refund to Buyer such portion of the Deposit in excess of the greater of: (i) 15% of the Purchase Price or (ii) Seller's actual damages. Notwithstanding anything to the contrary in this REPC, and specifically, this Section __, the indemnity obligations of Buyer under this REPC are separate and distinct obligations of Buyer that are not subject to the liquidated damage provisions contained in this REPC. Further, notwithstanding anything to the contrary in this REPC, the liquidated damages provisions contained in this REPC will not act to limit the amount of damages recoverable by Seller against Buyer if Buyer improperly, negligently, recklessly or intentionally records a lis pendens or other document or instrument

that impairs or could impair Seller's ability to sell the Lot to another Buyer.

> 4.2. **Seller Default.** If Buyer has complied with all of Buyer's obligations and Seller materially breaches this REPC, then Buyer may deliver to Seller a written notice demanding that Seller comply with the terms of this REPC within twenty (20) calendar days from receipt of notice to Seller. If at the expiration of such period Seller has not complied, then Buyer may, as its sole and exclusive remedy, terminate this REPC and recover the Deposit and any other payments made by Buyer to Seller, and the parties shall be released of all further duties and obligations under this REPC. Buyer acknowledges that Buyer shall have no right to specifically enforce this REPC or record a lis pendens or other document or instrument that impairs or could impair Seller's ability to sell the Lot to another Buyer. IN NO EVENT WILL SELLER BE LIABLE FOR CONSEQUENTIAL DAMAGES OR DAMAGES BASED UPON ANY INCREASED VALUE OF THE LOT. BUYER HEREBY RELEASES AND WAIVES ANY CLAIMS FOR SUCH DAMAGES. A material breach is a failure of performance by Seller which defeats the very object of this REPC.

(Ex. 2, First Addendum, ¶ 4).

14. Based on the foregoing provisions, if Plaintiffs defaulted, SMHG could receive fifteen percent (15%) of the purchase price, $110,325.00, or its actual damages.

15. Pursuant to the Sixth Addendum, on May 10, 2018, Plaintiffs deposited with GT Title $200,000.00 in additional earnest money, bringing the entire amount of earnest money deposited with GT Title to $347,100.00.

16. On information and belief, GT Title released the additional $200,000.00 to SMHG on or about May 14, 2018.

17. Closing on Lot 71 was delayed several times through the year 2020 for various reasons, such as issues with the architect SMHG recommended to Plaintiffs.

18. Between 2017 and 2021, Plaintiffs incurred costs for planning improvements to Lot 71, including losses totaling approximately $250,000.00 for architectural and engineering plans, snow removal, and other costs.

19.    On or about June 29, 2020, Plaintiffs wired an additional earnest money deposit of $100,000.00 to GT Title per an agreement with SMHG.

20.    SMHG alleges it never accepted the $100,000.00 deposited with GT Title in 2020.

21.    On or about April 27, 2021, GT Title released the original Earnest Money Deposit of $147,100.00 to SMHG.

22.    In or around June of 2021, SMHG sold Lot 71 to another person, Vijay Chattha, for $735,500.00, the same amount Plaintiffs had agreed to pay for Lot 71.

23.    SMHG, however, never sent Plaintiffs a valid notice as the REPC required to terminate the contract.

24.    GT Title was aware of the REPC and was charged with understanding its contents.

25.    GT Title knew that Plaintiffs had an interest in Lot 71 pursuant to the REPC.

26.    GT Title knew, actually or constructively, that Plaintiffs owned equitable title to Lot 71.

27.    GT Title did not verify that SMHG had sent Plaintiffs a valid notice of termination of the REPC.

28.    GT Title did not verify that SMHG refunded the earnest money deposits.

29.    GT Title assisted SMHG in transferring Lot 71 to Vijay Chattha, despite Plaintiffs' interest in and equitable title to Lot 71, and with the knowledge that the transfer would violate the REPC with Plaintiffs and result in SMHG converting Plaintiffs' deposits.

30.    GT Title did not inform Plaintiffs that SMHG had entered into an agreement to transfer Lot 71 to another person.

31.    On or about September 21, 2021, Plaintiffs learned that Lot 71 had been sold or transferred to another person.

32.     Via an email sent on the evening of September 21, 2021, Plaintiffs requested that GT Title wire the funds Plaintiffs had deposited back to Plaintiffs.

33.     On September 22, 2021, Plaintiffs emailed GT Title and requested confirmation that GT Title was still holding their deposited funds.

34.     On September 23, 2021, Brad Griffiths of GT Title responded to Plaintiffs by email and stated:

> The deposits received by GT totaled $450,100.00 with the most recent received on 6/30/2020.   Amounts totaling $347,100 were released to the seller in 2018 in keeping with the attached contract addendum.
>
> The balance of $103,000.00 remains on account with GT.
>
> Your contract on lot 71 was cancelled by the seller for non-performance.  You will need to work with Summit to resolve issues related to the funds released to them or the purchase of a Powder Mountain lot.  Let me know if the funds on account should be held for credit toward another purchase, or sent back to you.

35.     Plaintiffs requested GT Title refund the amount remaining in escrow and send Plaintiffs a copy of the cancellation notice GT Title was sent, as Plaintiffs never received one.

36.     On information and belief, GT Title never received notice of cancellation of the REPC.

37.     Plaintiffs subsequently rescinded their request to refund the remaining deposit amount via email as they had never received notice of cancellation or termination of the REPC and desired to complete the transaction.

38.     Brad Griffiths of GT Title replied by email that:

> Whether there is still a contract in place or which party has breached the contract is a factual inquiry that will need to be worked out between you and the seller.  What appears clear is that whatever remedy may be available to a buyer does not include rights in the specific lot that was the subject of the contract.

The sale of lot 71 to a different buyer closed with GT.

I saw your message to Summit.  We will hold the balance we have on account pending a resolution.

39.     Thereafter, Brad Griffiths claimed in an email to Mr. Eisenberg, "I was assured by Summit that they were in communication with you and that you were aware of what was happening."

40.     Plaintiffs asked GT Title, via email on September 28, 2021, why the $100,000.00 deposit was not returned for over a year if GT Title believed the REPC with Plaintiffs for Lot 71 had been cancelled and how GT Title came to the conclusion that a March 10, 2020 letter was notice that the REPC was terminated when roughly four (4) months later, on June 26, 2020, GT Title was asking to create a settlement statement.

41.     On September 29, 2021, Brad Griffiths replied via email:

We agreed to proceed with the closing to another buyer only after assurances from the seller that the contract with you was no longer in force, and that they would deal (were dealing) with you on the amounts that had been deposited, including the amount still in escrow with us.  At the time, I took to mean that perhaps your deposits would be applied to the purchase of a different lot.

Regarding any claim to the specific property, the remedies in the default/breach provisions of the contract (whether by buyer or seller) are limited to a return of deposited funds, and specifically preclude enforcement against the subject property itself.   I know you are in the process of working through this with Rory/Powder Mountain, so we will await that resolution and instructions on what to do with the amount still on deposit with GT.

42.     On January 21, 2022, Plaintiffs emailed Brad Griffiths:

Hi

  Hope all is well and you are enjoying the new year. At the current moment, I have been unable to reach a deal with the seller other than an insulting offer that they keep 15% of the total sales price.

7

Please note for future reference, as per the REPC, the seller is obligated to send me a 20 day notice to cure in order for there to be a buyer default. None of the documents you or seller has sent me included a 20 day notice (b/c none ever existed). The closest document you held (which was never sent to me/my addresses indicated in the REPC) was a 10day notice which was repudiated by the Seller at a later date making even the 10 day notice null and void. There is plenty of case law that strict compliance of the contract (20 day notice here) is necessary in order to cancel the sale of R/E. Please note, in my opinion based on case law, that my remedies are not restricted to the return of my deposit. When a party, in bad faith, cancels a deal, the limited remedies clause of the REPC will not apply. Thus, after doing my due diligence, I disagree w/ your analysis.

You asked that I reach out if I am not able to resolve the issue. Thus I have further questions.

You wrote me in the below email that you did not send back the 100K b/c you thought I intended to use the monies for an alternate lot. You also stated in a previous email that you believed Brian represented both the seller and buyer. Why did you believe Brian represented me? Did he infer or explicitly state that he was representing the buyer and/or did he state that I agreed to w/draw from the purchase? Did he state I would use the money for another property.

I never once discussed an alternate lot with Brian. So I'm trying to understand how you came to that conclusion and the best answer I can come to is that Brian held himself out to represent me and tricked you into believing such. Otherwise, based on my conversations w/ other title companies, you as the title company would need to notify me of the contract cancellation and were obligated to return the 100K w/in a reasonable time frame.

Thank you in advance for your explanation,

43.     Plaintiffs followed up on that email twice, on January 27, 2022 and January 30,

2022, before receiving any response from GT Title.

44.     On January 31, 2022, Brad Griffiths replied via email:

I'm sorry that you have been unable to reach an agreement with the other party to your contract.  Brian never held himself out to me as your agent, but the contract and other information about the transaction in general came to me through him.

8

It was the seller who notified me directly of their decision to sell to a different buyer, not Brian.  I assumed this meant that you might be purchasing a different lot only because a significant amount of money had already been released to the seller, and I had seen several lot changes with other buyers in the past who were in similar situations.  I had no reason to believe that you and the seller were not in communication about the situation.

You and the seller obviously disagree about the interpretation of contract terms, but I'm not sure how that involves GT.  I believe I have already given you the information I have about the situation and that GT fulfilled its obligations as escrow agent and that our involvement in this matter is concluded.  If you are suggesting that GT has done something that would expose it to legal liability, then any further communications will need to happen through our legal counsel.

45.     Plaintiffs emailed GT Title again on February 2, 2022 and asked for the name of the seller to whom Brad Griffiths referred, but did not receive a response.

### FIRST CAUSE OF ACTION
### Fraudulent Nondisclosure

46.     Plaintiffs incorporate the preceding paragraphs by reference as though fully set forth herein.

47.     GT Title had legal duty to communicate SMHG's contract or agreement to transfer Lot #71 to another person, which transfer would negatively impact Plaintiffs' interest in and equitable title to Lot 71.

48.     GT Title knew that SMHG had entered into an agreement to transfer Lot 71 to Vijay Chattha, but did not disclose this information to Plaintiffs.

49.     GT Title knew it had disbursed considerable amounts Plaintiffs' deposited funds under the REPC and knew it still held a considerable amount in Plaintiffs' deposited funds but did not disclose to Plaintiffs that the real estate they had contracted to purchase had been sold to another person.

9

50.     The nondisclosed information was material and GT Title had a legal duty to communicate the nondisclosed information to Plaintiffs.

51.     As a direct and proximate result of GT Title's failure to disclosure, Plaintiffs have incurred damages in an amount to be proved at trial.

52.     GT Title's nondisclosure was intentionally fraudulent or otherwise manifested a knowing and reckless indifference toward, and a disregard of, Plaintiffs' rights.

53.     GT Title should therefore be assessed punitive damages.

## SECOND CAUSE OF ACTION
### Civil Conspiracy—Conversion and Breach of Contract

54.     Plaintiffs incorporate the preceding paragraphs by reference as though fully set forth herein.

55.     GT Title joined a combination of two (2) or more persons, including agents of SMHG.

56.     The object to be accomplished by the combination was to sell Lot 71 in breach of the REPC with Plaintiffs, thereby causing SMHG to convert $347,100.00 from Plaintiffs.

57.     There was a meeting of the minds on the object or course of action.

58.     There were one or more unlawful, overt acts, specifically, GT Title did not disclose to Plaintiffs that SMHG entered into an agreement to transfer Lot 71 to another person/entity and did not disclose to Plaintiffs that it was holding at least $100,000.00 of Plaintiffs' money in escrow for a lot that was sold. Additionally, GT Title assisted SMHG to transfer Lot 71 to another person/entity through one or more acts, including drafting the title for the subsequent transfer or completing a title search and representing that Lot 71 was not under contract and that there was no cloud on title; thereby assisting SMHG to transfer Lot 71 to Vijay

10

Chattha, breach the terms of the REPC, and retain, through unlawful conversion, Plaintiffs'
deposited funds.

59.     Plaintiffs incurred damages in an amount to be proven at trial as a proximate
result of GT Title's conspiracy with SMHG.

60.     GT Title's acts or omissions as alleged in this Complaint and giving rise to this
cause of action are the result of willful, malicious and intentionally harmful conduct, or conduct
that manifests a knowing and reckless disregard of the rights of others. Consequently, Plaintiffs
are entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Aiding and Abetting—Conversion and Breach of Contract

61.     Plaintiffs incorporate the preceding paragraphs by reference as though fully set
forth herein.

62.     As described in this Complaint, SMHG breached its contract, the REPC, with
Plaintiffs and converted between $236,775.00 and $347,100.00 from Plaintiffs.

63.     GT Title was aware of SMHG's conduct in breaching the REPC and converting
Plaintiffs' deposited funds.

64.     GT Title knowingly participated and assisted in that breach of contract and
conversion.

65.     As a direct and proximate result of GT Title's conduct, Plaintiffs have been
damaged in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

66.     Plaintiffs incorporate the preceding paragraphs by reference as though fully set forth herein.

67.     As an escrow agent under Utah Code Ann. § 7-22-101, GT Title owed Plaintiffs a fiduciary duty and a requisite high standard of care.

68.     Specifically, GT Title had a duty to maintain Plaintiffs' deposits in such a manner as to preserve the deposits and protect the deposited funds from theft.

69.     GT Title also had a duty to disburse all escrow funds deposited with it in accordance with the REPC and addenda thereto.

70.     GT Title breached its fiduciary duty when it disbursed the Plaintiffs' deposited funds to SMHG and failed to inform Plaintiffs of material information.

71.     GT Title breached its fiduciary duty when it deprived Plaintiffs of the opportunity to utilize their deposited funds, including to earn interest, despite GT Title allegedly believing the REPC had been cancelled.

72.     GT Title also breached its fiduciary duty and requisite high standard of care when it assisted SMHG in transferring title of Lot 71 to someone other than Plaintiffs.

73.     Plaintiffs were damaged in an amount to be proven at trial.

74.     Plaintiffs should also be awarded punitive damages, as GT Title's breaches of its fiduciary duty were deceptive, fraudulent, willful and knowing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.      Compensatory damages in the principal amount of $347,100.00 plus interest, or, alternatively, $236,775.00 plus interest;

2.      Compensatory damages for the loss in expectation value based on the appreciation of the property in an amount to be determined at trial;

3.      Compensatory damages for costs incurred for planning improvements to Lot 71, including losses totaling approximately $250,000.00 for architectural and engineering plans, snow removal, and other costs in an amount to be determined at trial;

4.      Compensatory damages for Plaintiffs' lost opportunities to utilize their deposited funds;

5.      Pre-judgment interest and post-judgment interest as allowed by law at the time judgment is entered;

6.      Punitive damages on Plaintiffs' claims for fraudulent nondisclosure, civil conspiracy, and breach of fiduciary duty;

7.      Attorney fees and costs permitted by contract, statute, or other applicable law; and

8.      For any other or further relief the Court deems just and proper.


DATED this 23rd day of April, 2024.

MORRIS DEVOE

/S/ Lauren DeVoe
Lauren DeVoe
Stephen K. Aina
Attorneys for Plaintiffs


Plaintiffs' Address:
c/o Morris DeVoe
7070 South Union Park Avenue, Suite 220
Midvale, Utah 84047